

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 6, 2014**

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| DAVID WAYNE SMITH and | § | Case No. 10-50096-rlj-12 |
| PATRICIA JOYCE SMITH, | § | |
| | § | |
| Debtors. | § | |
| | § | |

### MEMORANDUM OPINION

In the second year of their chapter 12 bankruptcy plan, the debtors, David and Patricia Smith, sold-off 396.47 acres of a 458-acre tract of land for $295,576.  The sales price exceeded by more than $100,000 the value established for the entire 458-acre tract at the time the Smiths' chapter 12 plan was approved by the Court.  After paying the costs of the sale, claims secured by the land, taxes incurred as a result of the sale, and certain other proper expenses, the Smiths were left with $35,341.59 (and, presumably, the balance of the 458-acre tract).  This windfall has created a bit of a feud over its proper use in this bankruptcy case.

PAGE 1

The parties—David and Patricia Smith, the debtors; aligned creditors Security State Bank ("SSB") and Tommy and Nancy Thrash ("Thrash"); and the chapter 12 trustee ("Trustee"), Walter O'Cheskey[1]—have stipulated that the Court's resolution of three questions resolves their dispute.

1. Do the proceeds from the sale of the non-exempt land constitute property of the bankruptcy estate, or are they the debtors' property and thus not subject to any claims by creditors of the estate?

2. If the proceeds are property of the estate, do they also constitute "disposable income" to be distributed to allowed unsecured claim holders pursuant to the Smiths' chapter 12 plan?

3. If the proceeds are both estate property and "disposable income," how should the balance of the proceeds be distributed by the Trustee?

The parties further stipulated that the Court has jurisdiction to decide these issues. The Court agrees that it has authority to decide the issues submitted. *See* 28 U.S.C. §§ 1334(b) and 157(b)(1), (2)(A), (L), and (O).

## Background

### A.

The Smiths filed their chapter 12 petition in 2010. The Second Amended Chapter 12 Plan was confirmed on November 22, 2010. SSB originally filed Claim 16-2 (amended) for $701,820.51, but it was reduced based on a pre-confirmation sale of certain collateral. Accordingly, SSB eventually held a bifurcated claim that was allowed for (1) $181,817.72, which was secured by real estate and fixtures, and (2) an unsecured claim in the amount of $31,898.96. *See* Order Confirming Debtors' Chapter 12 Plan of Reorganization [Docket No. 98]. On March 24, 2001, SSB assigned this claim, Claim 16-2, to Thrash. Additionally, SSB

---

[1] Mr. O'Cheskey retired as the Standing Chapter 12 Trustee after submission of this matter. The new Chapter 12 Trustee and thus the proper party in interest now is Michael B. Kloiber.

filed Claim 15-2 for $66,045.52, which was allowed by the plan in the amount of $42,672.83. *Id.* Claim 15-2 was secured by non-exempt equipment and vehicles.

The confirmed plan contained several provisions relevant to the questions at hand as stated in the Agreed Stipulations of Fact submitted by the parties:

a. Debtors retained approximately 458 acres of non-exempt farmland/pastureland which was valued at $183,591.08, the same had no equity on the date of confirmation (i.e., secured liens were retained by Lamb County Appraisal District $1,773.36 and SSB $181,817.72), and the claim of SSB secured by the land was to be paid over 6 years ("the Land Note"). [Dkt. 98, p.4];
b. Debtors retained their exempt homestead, a residence in Hart, Texas, and were required to pay an ad valorem tax lien in the amount of $7,858.65 [to] Castro County Appraisal District directly ("the Castro CAD lien") [Dkt. 98, p. 4];
c. Debtors retained certain non-exempt farm equipment which was valued at $42,672.83 on the date of confirmation and the same had no equity on that date (i.e., SSB retained a lien on said equipment to secure payment of the $42,672.83 secured claim which was amortized over 10 years, 7% interest, with a 7-year balloon--6 annual principal and interest payments of $6,075.65 with the first payment due 10/25/11 and on October 25 of each [year] thereafter until 10/25/17 when the remaining balance is due in full) ("SSB Equipment Note") [Dkt. 98, p. 5];
d. Allowed general unsecured deficiency and general unsecured claims totaling $49,995.26 are to be paid out of any "Projected Disposable Income" [Dkt. 98, pp. 11-12];
e. The "Projected Disposable Income" under the confirmed Plan required Debtors to "pay at least $0.00 to unsecured claims" over the 3-year period beginning January 2010 [Dkt. 98, p. 2];
f. The Plan, when confirmed, vested all property of the estate in Debtors free and clear of any claim or interest of any creditor provided for in the Plan pursuant to 11 U.S.C. § 1227(b), except as provided in 11 U.S.C. § 1228(a), the Plan, or the order confirming the Plan. [Dkt. 98, p. 4, parg. 11];
g. The confirmed Plan contained a liquidation analysis which showed there was no non-exempt property available to pay allowed unsecured claims upon confirmation [Dkt. 90, p. 10, Ex. B];
h. No objections were made to the property values included in the Plan and order confirming the Plan and, as such, said values were binding on the Debtors, creditors, and the Trustee as of the date of confirmation [Dkt. 90, pp. 6, 10-11; Dkt. 98, pp. 1, 4-5, 11];
i. Payments to unsecured creditors, if any, pursuant to the Plan would come from "disposable income, if any, generated by Debtors' farming operations during the 3-year life of the Plan" [Dkt. 90, p. 3, parg. 5(b)];
j. The projected income to fund the Plan was contemplated, at confirmation, to come from social security income, W-2 wages, custom farming, pasture rent,

and direct farming (i.e., crops, insurance, and government payments). [Dkt. 90, Ex. D];

k. Regarding its pre-petition secured claim on the 458 acre tract, SSB agreed at confirmation that the value of the land was $183,591.08 and also agreed to bifurcate its claim as follows: $181,817.72 secured; and $31,898.97 unsecured [Dkt. 98, p. 4]; and

l. The prepetition junior lien held by Lamb County Electric on the 458 acre tract was invalidated under the Plan due to the valuation of said land. [Dkt. 12, p. 10; Dkt. 90, p.4].

*Agreed Stipulations of Fact and Designation of Issues Re: Joint Motion to Distribute Funds & Debtors' Motion to Modify Chapter 12 Plan* [Docket No. 173].

**B.**

Prior to confirmation, the Smiths sold some land and equipment, but they retained the 458 acres of land addressed by the plan; it was one source of potential income to fund the plan. In the first year of the plan, the Smiths made the required plan payments, and no disposable income was realized with which to pay unsecured claims. The second year, the Smiths defaulted on their plan, and a motion was filed by the Trustee to dismiss the case. In response, the Smiths filed a motion to sell 396.47 of the 458 acres for a sales price of $295,576. The motion specified that the sales price was to pay lienholders, Thrash, and Lamb County Appraisal District in full, with any remaining proceeds to pay "expenses of sale, legal fees, capital gains taxes due on the sale, and other obligations due under the Plan." The motion to sell was unopposed and an Agreed Order was approved and entered. The Agreed Order authorized the sale and specifically approved payment of "(a) costs and expenses of the sale of the property; (b) Debtors' legal fees relating to the negotiation of the sale of the property; (c) payment of past due ad valorem taxes and the 2012 ad valorem taxes; and (d) the amount of the secured claim owed to [Thrash]." Additionally, the order also authorized the payment of statutory fees due to the Trustee on the 2012 plan payments. After the sale was complete and all authorized payments were made, a

joint check to the Smiths and the Trustee was made for $92,594.19. The Trustee subsequently used a portion of these funds to pay 2012 plan payments, attorney's fees, trustee's fees, federal taxes (incurred primarily from the land sale), and ad valorem taxes, resulting in a remaining balance of $35,341.59.[2] *See* Agreed Stipulation of Facts at ¶¶ 16–22.

## C.

Three relevant motions were filed at the end of 2013: (1) a joint motion filed by SSB and Thrash to distribute funds and pay creditors in full [Docket No. 148]; (2) the Smiths' motion to modify the plan [Docket No. 152], which was later withdrawn; and (3) the Smiths' motion to pay post-confirmation administrative and other expenses [Docket No. 159]. The Trustee filed responses opposing SSB and Thrash's motion and the Smiths' motion to modify the plan. The Smiths also filed a response objecting to the SSB and Thrash motion. No objection was filed to the Smiths' motion to pay administrative and other expenses, and an order granting the motion was entered on December 13, 2013.

## **Discussion**

Given the volley of motions, briefs, and stipulations, the Court distills the parties' desires down to the following:

- SSB, by its motion jointly filed with Thrash, wants its secured claim paid off.[3]

- Thrash, also by the joint motion, wants its unsecured claim of $31,898.96 paid off.[4]

- The Trustee does not want to pay-off SSB; instead, he wants to bring its secured claim current and then use the balance of the proceeds to pay unsecured creditors.

---

[2] On May 20, 2014, the parties entered into an agreed order to pay the October 2013 plan payment to SSB [Docket No. 190], and therefore, the Court is unaware of the current balance of the funds.

[3] *See supra* note 2. At the time of the Agreed Stipulation, SSB's remaining secured claim was $21,125.98, but the Court is unaware of the current balance of SSB's claim after the payment made to it pursuant to the May 20 agreed order.

[4] The remaining funds are obviously not sufficient to pay-off both SSB's secured claim and Thrash's unsecured claim.

PAGE 5

- The Smiths want to pay-off SSB's secured claim and then retain the balance of the sales proceeds for their use as they see fit.

The issues here are addressed by §§ 1207 and 1227 of chapter 12 of the Bankruptcy Code, which provisions are virtually identical to §§ 1306 and 1327, respectively, of chapter 13 of the Bankruptcy Code. "Because chapter 12 was modeled on chapter 13, and because so many of the provisions are identical, chapter 13 cases construing provisions corresponding to chapter 12 provisions may be relied on as authority in chapter 12 cases." *Hall v. United States*, 132 S. Ct. 1882, 1889 (2012) (quoting 8 Collier on Bankruptcy ¶ 1200.01[6] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.). Chapter 13 cases are also proper authority on the issues before the Court. *See id.*

### A.

In *Barbosa v. Solomon*, the First Circuit considered a scenario similar to the one before the Court. 235 F.3d 31 (1st Cir. 2000). In *Barbosa*, the debtors owned a two-family building that they retained for investment purposes. *Id.* at 33. A plan was confirmed and the confirmation order contained the following language: "[T]he provisions of the confirmed Plan bind the debtors and all creditors; the confirmation of the Plan vests all property of the estate in the debtors; and all property vesting in the debtors is free and clear of any claim or interest of any creditor, except as provided in the Plan or this order." *Id.* (emphasis removed). The plan provisions thus tracked § 1327 of the Bankruptcy Code. *See* 11 U.S.C. § 1327. After confirmation, the debtors obtained permission from the court to sell the property. *Barbosa*, 235 F.3d at 33. Following the sale, the debtors and trustee could not agree on distribution of the proceeds, and the trustee sought to compel the debtors to modify their plan so that the excess proceeds from the sale would be paid to unsecured creditors. *Id.* The debtors opposed the motion. *Id.* at 34. The bankruptcy court granted the trustee's motion and ordered that the

debtors' plan be amended to distribute the funds to the creditors. *Id.* The court felt that because the plan did not address prepayment of unsecured claims, the debtors' motion to sell was "implicitly seek[ing] to modify their plan to reduce the time for satisfying the claims of unsecured creditors." *Id.* The bankruptcy court therefore held that the proposal that the debtors would keep the proceeds, while paying 10% to the unsecured creditors, did not satisfy the good-faith requirement and the best-interests test, and further, that while "the Property sold vested in the Debtors free and clear of any claim from the creditors, the result in this case by allocating the appreciation of the property, which the court characterized as windfall profits, to the Debtors rather than to the unsecured creditors 'is antithetical to the results that would be achieved in the absence of a confirmed plan that vested the Property in the Debtors.'" *Id.* (internal citations omitted). The district court affirmed the bankruptcy court under a different rationale. The district court interpreted "property of the estate" to "vest[] title to the realty in the Debtors at confirmation, but not the proceeds of the sale." *Id.* at 35.

On appeal, the First Circuit affirmed the decision of the district court. *Id.* at 41–42. The court noted that the meaning of "vesting" as used in § 1327(b) and its relation to § 1306 has been explored by many courts with differing results. *Id.* at 36. The court favored the approach that the property of the estate at confirmation vests in the debtors free and clear of creditors' claims but that the estate does not cease to exist and continues to be funded by regular income and certain post-petition assets as provided for in § 1306. *Id.* at 36–37. In adopting this approach, the court stated that this approach had "logical consistency that harmonizes two apparent inconsistent sections." The court noted that this approach must be applied flexibly because in spite of the vesting component, "until all payments due under the plan are made, both the trustee and the unsecured creditors have an interest in the preservation of the debtor's financial situation,

and in the extension of the ability-to-pay standard to future situations under the plan." *Id.* at 37. Because the debtors' financial circumstances had been altered by receiving the proceeds, § 1329, the modification provision of chapter 13, came into play. The court did not adopt the "substantial and unanticipated test" as a condition to modification and found that res judicata did not preclude the trustee and creditor from seeking a modification of the plan post-confirmation. *Id.* at 41. The First Circuit closed its analysis by saying "it is antithetical to the bankruptcy system to allow a debtor to 'strip down' a mortgage, underpay the unsecured creditors, and obtain a super discharge under section 1328(a) of the Code, while selling the property mortgaged for a price of two times its estimated value for purposes of the 'strip down,' and keeping to himself the excess of the proceeds." *Id.*

Another court within the First Circuit analyzed the law further in the context of a refinancing rather than a sale of property. *In re Kieta*, 315 B.R. 192 (Bankr. D. Mass. 2004). The case raised the following similar issues: (1) whether the appreciation in value, obtained through refinancing, was property of the estate; (2) whether the appreciation must be used to increase the dividend payable to unsecured creditors; and (3) whether the plan and schedules must be amended to account for appreciation in value and receipt of the proceeds. *Id.* at 193. The debtor's confirmed chapter 13 plan specifically provided, "[u]nless otherwise ordered by the court, all property of the estate as defined in 11 U.S.C. §§ 541 and 1306, *including, but not limited to, any appreciation in the value of real property* owned by the debtor, as of the commencement of the case, shall remain property of the estate during the term of the plan and shall vest in the debtor(s) only upon discharge." *Id.* at 194 (emphasis modified). After several various motions to dismiss or seek relief from the stay were filed and ultimately withdrawn, the debtor filed a motion to refinance. *Id.* at 194–95. In her motion, she stated that the holder of the

first mortgage was owed $191,000, remaining plan payments totaled $15,000, and that granting the motion would be in the best interests of the estate, creditors, and the debtor; she expounded on this, "[t]he debtor will gain her discharge earlier than expected under the plan and creditors and the estate will receive their dividend more than 2 years earlier than projected." *Id.* at 195. The loan form showed an appraised amount $104,000 higher than the value of the property listed in her schedules. *Id.* The court found that while *Barbosa* involved the sale of property and the case before it arose from a refinancing, *Barbosa* was still controlling concerning its statements on congressional intent. *Id.* at 197. The court also granted the chapter 13 trustee's request that the debtor file a modified plan as a way to recognize the appreciation in value. *Id.* The court noted that not only did the confirmation order specifically provide that the property *and any appreciation in its value* remained property of the estate, the debtor's motion to refinance, which essentially sought to realize the appreciation and keep the proceeds in excess of plan payments and other costs for herself, violated "the precepts articulated by the First Circuit" and it would not be permitted. *Id.* at 198.

A bankruptcy court in Florida reached a result different from that of *Barbosa* and *Kieta*.[5] *In re Euler*, 251 B.R. 740 (Bankr. M.D. Fla. 2000). In *Euler*, the debtors sought authority to sell property and use the net proceeds to pay-off the balance of the confirmed plan. *Id.* at 742. Though the property had appreciated since confirmation, the motion did not propose to use any additional value to pay the creditors beyond the plan requirements. *Id.* The trustee objected to the use of the appreciation proceeds, arguing that § 1329 allowed the trustee to seek modification of the plan to capture the value of the proceeds for the benefit of the creditors. *Id.* The motion to sell indicated a sales price of $207,000, which would result in proceeds in the amount of

---

[5] There is, in addition, some authority that when a chapter 13 is being converted to a chapter 7, the majority of courts have found that "equity attributed to appreciation in a property's value may not be claimed by the trustee in a converted case." *In re Burt*, 2009 WL 2386102, No. 09-40016, *6 (Bankr. N.D. Ala. July 31, 2009).

**PAGE 9**

approximately $60,000. *Id.* at 743. The issue before the court was whether a trustee could modify a confirmed plan to increase the unsecured creditors' distribution as a result of the sale of property owned pre-petition that appreciated post-confirmation. *Id.* The court recognized a split among the courts on whether a substantial and unanticipated change in circumstances must be shown to justify a modification. *Id.* at 744. Section 1329 contains no such requirement. *See* 11 U.S.C. § 1329. The court said that while the plain-meaning approach is simple and appropriate in cases involving clear and unambiguous statutory construction, § 1329 is not such a statute. *Id.* The court noted that the purpose of chapter 13 is "to encourage financially overextended individuals to make greater voluntary use of repayment plans."[6] *Id.* A chapter 13 plan must provide that unsecured creditors receive as much or more than they would in a chapter 7 case and must propose payment in full to unsecured creditors, or all of the "projected disposable income" over the three-year plan must be applied to make plan payments. *Id.* at 745. The court stated that the confirmed plan in the case before it neither provided for an adjustment in the payment to unsecured creditors in the event of appreciation of property, nor was use of equity in the debtors' real property assets contemplated as a method to pay unsecured creditors. *Id.* The court reasoned that the debtor could not have been forced or compelled to include any such provision in the plan as long as the other requirements of § 1325(a) were satisfied. *Id.*

The court found that a literal reading of § 1329 would permit the trustee to amend the plan, which would be at odds with the intentions of the drafters of chapter 13 as the trustee could accomplish through an amendment what he or she could not have accomplished at plan confirmation. *Id.* The court believed that allowing the trustee to make such an amendment to secure treatment of assets that existed at confirmation would "defeat the Debtor's exclusive right

---

[6] *Euler* was decided before the 2005 amendments to the Bankruptcy Code and thus the advent of means testing that *requires* many debtors to proceed under chapter 13.

to file a Chapter 13 Plan. At best, it would make Chapter 13 ambiguous as to a debtor's exclusive right to file a plan dealing with the debtor's assets and liabilities as of the date of confirmation." *Id.* The court stated it was clear that the confirmed plan was binding on the debtor and all the creditors. *Id.* at 746. "All participants . . . are barred by the doctrine of res judicata from asserting matters they could have raised in the bankruptcy proceedings." *Id.* Accordingly, the court held that either claim preclusion or res judicata barred the trustee from raising facts that were known or could have been discovered prior to confirmation of the plan as grounds for a modification; the test to be applied is an objective determination if "the change could have been reasonably anticipated at the time of confirmation." *Id.*

Next, the court considered whether the appreciation of real estate post-confirmation was a windfall and found that it was not. Changes in real estate's value "can hardly be considered to be unanticipated" and are "just an incident of ownership." *Id.* at 747. The court found this situation easily distinguishable from unanticipated events such as a lottery winning or receipt of an inheritance. *Id.* "[T]he Trustee could have anticipated the possibility that real estate may appreciate and objected to the Plan—on the basis that the Plan did not provide that the appreciated value of any real estate would be liquidated and applied toward the amount owed to unsecured creditors." *Id.* Absent a provision that the equity of appreciated property would be available to increase the distribution to unsecured creditors, "confirmation acts as res judicata on the issue of whether the proceeds from appreciated real estate, existing at the time of confirmation, should be added to the debtor's disposable income (to be applied to payment of unsecured creditors if and when such real estate appreciates)." *Id.*

Finally, the court determined that proceeds from the sale were not disposable income. The court considered, and ultimately followed, other cases holding that a debtor is entitled to any

later appreciation of property retained at confirmation but also must suffer any depreciation or loss that occurs. *Id.* at 747–48. Quoting a Ninth Circuit B.A.P. opinion, the *Euler* court said it believed the better view was that "the proceeds of the sale of a debtor's real estate in a chapter 13 case never become disposable income for purposes of chapter 13." *Id.* at 748 (quoting *In re Burgie*, 239 B.R. 406, 409 (B.A.P. 9th Cir. 1999)). The court held that pre-petition real estate is a capital asset rather than post-petition income, and a debtor cannot be compelled to use the proceeds to pay creditors pursuant to a plan modification. *Id.*

**B.**

While not in a case that is directly on point factually, the Court has previously considered what constitutes property of the estate. *In re Powers*, 435 B.R. 385, 389 (Bankr. N.D. Tex. 2010). The Court adopted the view that "estate property that exists at the time of confirmation vests in the debtor per section 1327(b), but property acquired by the debtor after confirmation becomes estate property[.]" *Id.*

The Court considers the issue before it within the framework of the view it endorsed in *Powers*. Section 1227 is clear. The provisions of the confirmed plan are binding on the debtors and their creditors. *See* 11 U.S.C. § 1227(a). Estate property vests in the debtor—and thus leaves the bankruptcy estate—upon confirmation of the plan. *See* § 1227(b). And such vesting is "free and clear of any claim or interest of any creditor provided for by the plan." § 1227(c).

The 458-acre tract left the estate at confirmation. The extent to which it secures debt or is otherwise subject to the claims of creditors is governed exclusively by the Smiths' confirmed plan. Apart from the plan's provisions, the Smiths have the right to decide how to use the 458-acre tract. The Court fails to appreciate how any appreciation in value of the 458-acre tract somehow alters such right. The appreciation of the property, and thus the $35,341.59, is not

property of the estate and is not subject to the Motion to Distribute Funds and Pay Creditors in Full. In reaching this conclusion, the Court recognizes that its holding is contrary to the holding of the First Circuit in *Barbosa*.[7] The holding in *Barbosa* is premised upon the theory that though estate property vests in the debtor upon confirmation, its proceeds,[8] if realized post-confirmation, become estate property. This simply does not accord with the Court's reading and analysis of the statute.

Even if the post-confirmation appreciation in value was property of the estate, the appreciation is not disposable income. "Disposable income" is defined as "income which is received by the debtor and which is not reasonably to be expended (A) for the maintenance or support of the debtor or a dependent of the debtor or for a domestic support obligation . . . ; or (B) for the payment of expenditures necessary for the continuation, preservation, and operation of the debtor's business." 11 U.S.C. § 1225(b)(2)(A)–(B). *Burgie* provides a thorough analysis of why post-confirmation appreciation is not disposable income. 239 B.R. at 409–12. "Postpetition disposable income does not include prepetition property or its proceeds," and chapter 13 creditors have no claim to such assets. *Id.* at 410 (citing *Hagel v. Drummond*, 184 B.R. 793 (B.A.P. 9th Cir. 1995) and 1 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY §§ 1.7, 1.21, 1.44, 8.17 (2d ed. 1997)). Creditors are instead protected by the provision that they receive as much or more than they would have in a liquidation. *Id.* A debtor's prepetition capital asset does not create disposable income. *Id.* Further, case law supports this interpretation that "[o]nly regular income and substitutes therefor can be counted in the determination of

---

[7] Though the bankruptcy court in *Kieta* followed *Barbosa*, its holding can be reconciled with the Court's conclusion here. In *Kieta*, the confirmed plan specifically provided that all estate property and any appreciation to its value remained as estate property.

[8] The term "proceeds" refers to its usage under § 541 of the Bankruptcy Code, which section defines what property constitutes "property of the estate." It includes proceeds of or from estate property. § 541(a)(6). This refers to "proceeds" in a broad sense and is not confined to the meaning accorded "proceeds" under the Uniform Commercial Code. *See* 5 Collier ¶ 541.15. Proceeds here refers, literally, to all funds realized from sale of the real property. The proceeds replace, or are a substitute for, the real property that was sold.

**PAGE 13**

disposable income for the purposes of the chapter 13 test . . . ." *Id.* The appreciation in question before the Court is not "disposable income." It derives from a pre-confirmation capital asset and provides no stream of payments, nor is it regular income or a substitute thereof.

This distinction between property and income is consistent with the principles reflected in the statute itself. A basic precept of chapter 13 is that chapter 13 debtors dedicate their disposable income for payments to unsecured creditors. *See* 11 U.S.C. § 1325(b)(1)(B). Disposable income under chapter 13 refers to "current monthly income" received by the debtor. § 1325(b)(2). These concepts are repeated under chapter 12 but with disposable income defined as just "income" rather than "monthly" income received by the debtor. *See* § 1225(b)(2). This is obviously a recognition of the particular circumstance of farmers, many of whom receive income seasonally rather than monthly. Then, the interplay of §§ 1306 and 1327 (and §§ 1207 and 1227) provides that *property* acquired post-filing and up to confirmation is estate property that passes to the debtor upon confirmation; *earnings*, however, constitute estate property throughout the case and thus never pass to the debtor. That earnings are estate property at all times until the case is finalized recognizes that they are by their very nature periodic. They come in, are spent, and the cycle continues. And earnings, especially from services, are synonymous with income. *See Black's Law Dictionary* 621 (10th ed. 2014).

### C.

Having concluded that the proceeds from the land sale are neither estate property nor disposable income, the Court does not need to reach the third stipulated question. The Motion to Distribute Funds and Pay Creditors in Full will be denied.

### End of Memorandum Opinion ###